In the Matter of REDFEATHER FAST FREIGHT, INC., Elmer Wilson, d/b/a E & J Leasing and Nebraska Beef Express, Bankrupts.

Merle NICOLA, Trustee, Plaintiff,

v.

NORTHFIELD INSURANCE COMPANY, Defendant and Third-Party Plaintiff,

v.

AMERICAN INTERNATIONAL CREDIT CORPORATION, County Wide Insurance Agency, Inc., and Mark III General Insurance Agency, Third-Party Defendants.

Bankruptcy Nos. BK78-0-432, BK78-0-438.

United States Bankruptcy Court, D. Nebraska.

Dec. 10, 1979.

**448**

Michael G. Helms, Omaha, Neb., for Merle Nicola, trustee.

Stephen G. Olson, Omaha, Neb., for Mark III General Ins. Agency.

Clayton H. Shrout, Omaha, Neb., for Country Wide Ins. Agency, Inc.

Eugene L. Hillman, Omaha, Neb., for American Intern. Credit Corp.

## MEMORANDUM OPINION

DAVID L. CRAWFORD, Bankruptcy Judge.

In this interpleader action, we resolve a dispute over the entitlement to funds paid into Court. Northfield Insurance Company paid the money into Court and the dispute is between the other third-party defendants and the plaintiff.

The parties have agreed that the following may be accepted as established facts for the purposes of this case only:

"That plaintiff, Merle Nicola, is the duly qualified and acting Trustee of the Estate of Redfeather Fast Freight, Inc., bankrupt. That Redfeather Fast Freight, Inc., was a corporation organized and existing under and by virtue of the laws of the State of Nebraska, with its principal place of business in Omaha, Nebraska. Redfeather Fast Freight, Inc. ('Redfeather') filed an original petition in this Court under Chapter XI of the Bankruptcy Act on April 7, 1978, and was thereafter adjudicated a bankrupt on September 15, 1978.

"Northfield Insurance Company is a corporation organized pursuant to the laws of the State of Delaware and with its principal place of business in St. Paul, Minnesota. At all times material hereto, Northfield Insurance Company was in the business of writing and issuing insurance coverages for transportation related industries. Northfield Insurance Company ('Northfield') at all times material hereto has transacted business in approximately 26 states, including the State of Nebraska.

"That Mark III General Insurance Agency is a general insurance agency maintaining places of business in Omaha, Nebraska, and Des Moines, Iowa. At all times material hereto, Mark III General Insurance Agency ('Mark III') has served as general agent and has acted for and on behalf of Northfield Insurance Company, pursuant to contract between Northfield and Mark III.

"That Country Wide Insurance Agency, Inc., is a Nebraska corporation maintaining its principal place of business in Omaha, Nebraska. Country Wide Insurance Agency, Inc. ('Country Wide') for purposes of the transactions which are the subject of this adversary proceeding has served as an insurance broker, for purposes of selling the insurance policy to Redfeather.

"American International Credit Corporation (AICCO) is a corporation with its principal place of business in New York, New York, which at all times material hereto was in the business of providing insurance premium financing.

"That on or before February 10, 1978, Redfeather and Country Wide entered into negotiations for the sale to Redfeather of certain motor truck cargo insurance coverage. In February, 1978, Country Wide obtained such insurance coverage for Redfeather from Mark III, as the general agent of Northfield. Pursuant to said negotiations and agreements, Northfield thereafter issued its motor truck cargo insurance policy number FPF05110 providing insurance coverage for the insured, Redfeather, for the period February 10, 1978, to February 10, 1979. Negotiations on behalf of Northfield with respect to providing this coverage were conducted by Mark III. Negotiations with Redfeather on behalf of Mark III were conducted by Country Wide.

"In order to provide for payment of premiums for this policy as well as other insurance coverages obtained for Redfeather by Country Wide, Redfeather entered into a premium finance agreement with AICCO (Exhibit '2'). Notice of acceptance of this agreement was given by AICCO on March 28, 1978 (Exhibit '4'). The premium finance agreement was executed by Redfeather as the insured, and by Country Wide as the broker at Omaha, Nebraska, during February, 1978. Pursuant to said premium finance agreement, AICCO agreed to advance on behalf of Redfeather, and did so advance on behalf of Redfeather, certain moneys to Country Wide for the purpose of paying the premiums on said insurance policy issued to Redfeather. On March 28, 1978, AICCO sent notice of the financed premium to Northfield (Exhibit '5'). Northfield responded by disclaiming any responsibility for the financed premium (Exhibit '6'). The amounts advanced by AICCO were forwarded to Country Wide and thereafter disbursed by Country Wide to pay premiums on various policies issued to Redfeather. A part of the moneys advanced by AICCO and delivered to Country Wide were forwarded to Mark III in payment of the deposit premiums on the policy issued by Northfield. The premiums were thereafter paid to Northfield, less Mark III's commission, pursuant to a system of charges and credits on Mark III's agency account with Northfield. Other than as described above, AICCO has never taken any of the actions set forth in Article 9, UCC to perfect any security interest that might have been created by the premium finance agreement.

"Pursuant to the premium finance agreement, Redfeather thereafter paid to AICCO the installment payments due for the months of March and April of 1978, and the sum of $12,000.00 in part payment of the installment payment due in May of 1978. These payments were delivered to AICCO through Country Wide. Redfeather has made no further payments to AICCO, and is in default of its obligations under the premium finance agreement.

"The policy issued by Northfield to Redfeather was cancelled effective at 12:01 o'clock a. m. on July 6, 1978. As of that date, there was an unearned premium paid on the insurance policy in the sum of $26,936.00.

"On October 6, 1978, Mark III made demand upon Northfield for return of the unearned premium in the sum of $26,936.00, (Exhibit '9') for the stated purpose of forwarding the money to AICCO. Also on October 6, 1978, Country Wide made demand upon Northfield for return of the unearned premiums, (Exhibit '8') again for the stated purpose of turning them over to AICCO. On September 18, 1978, AICCO made demand upon Northfield for return of the unearned premiums (Exhibit '7').

"On December 15, 1978, Northfield paid to the Clerk of the United States District Court for the District of Nebraska, in these proceedings, the sum of $26,936.00, said amount representing the amount of unearned premiums due from Northfield on said insurance policy."

Although premium financing arrangements are standard practice in the insurance industry, the case law pertaining to them is sparse. Provided the finance company and the insurer are independent entities, premium financing has been held valid by courts which have considered the issue.[1] One court has described premium financing as follows:

"Premium financing involves an advance by the finance company to the insurance company or its agent of the premium due for the full term of the policy. This advance is then repaid by the insured to the finance company in amortized monthly installments which includes an additional amount to cover financing charges. The finance company is secured in making this advance by obtaining the right to cancel the policy and to receive the return

---

1. Compare *Kaufman v. McLaughlin Co.*, 123 U.S.App.D.C. 92, 357 F.2d 283 (D.C.Cir. 1966) (premium financing by independent entity held valid) with *Clark v. Employers Mut. Cas. Co.*, 90 F.2d 667 (8th Cir. 1937) (premium financing by officer of the insurer held invalid).

premium due upon cancellation if timely repayments are not made."

*Baker & Co. v. Preferred Risk Mut. Ins. Co.*, 569 F.2d 1347, 1348 (5th Cir. 1978); see also *Citizens State Bank v. Travelers Indem. Co.*, 7 Wis.2d 451, 96 N.W.2d 834, 836 (1959).

■ Inherent in this description is an assumption that the financing company is a lender rather than a guarantor or surety. Since AICCO was required to pay the full premium for Redfeather rather than merely stand ready to pay in the event of Redfeather's default, the Fifth Circuit's characterization of such transactions as secured loans is correct and will be followed by this Court.

■ Given this characterization, AICCO could have no right to any unearned premiums due on the insurance policy unless such right was effectively assigned to it by the insured. 4A *Collier on Bankruptcy*, Para. 70.24 at 337–38 (14th Ed. 1978); *La-Bour v. Allen*, 165 F.Supp. 471, 472–73 (W.D. Mich.1958). The effectiveness of an assignment is a matter to be determined by reference to the applicable state law. *Adelman v. Centaur Corp.*, 145 F.2d 573, 575–76 (6th Cir. 1944). In a multi-state transaction such as this one, the first problem is to determine which state's law is applicable. As neither Mark III nor Northfield were parties to the premium financing agreement, the choice can be narrowed at the outset to two states: New York, the headquarters of AICCO; and Nebraska, the headquarters of Redfeather and Country Wide.

The premium finance agreement provided that the finance contract would not be effective until accepted in writing by AICCO. This provision, especially when combined with the consideration that AICCO did not initiate the transaction, would probably lead a Nebraska court to conclude that New York law governs the validity of the assignment. See *Exchange Bank & Trust Co. v. Tamerius*, 200 Neb. 807, 810–11, 265 N.W.2d 847 (1978); *Dunlop Tire & Rubber Corp. v. Ryan*, 171 Neb. 820, 824, 108 N.W.2d 84 (1961); *Young v. Order of Unit-*

*ed Commercial Travelers*, 142 Neb. 566, 569, 7 N.W.2d 81 (1942); *Farm Mortgage & Loan Co. v. Beale*, 113 Neb. 293, 294, 202 N.W. 877 (1925). However, this issue need not be decided, as the results in this case are identical under the law of either jurisdiction.

■ The trustee argues that Nebraska law applies and that the assignment is unperfected under Nebraska law because no financing statement was ever filed. As New York has also enacted the Uniform Commercial Code, if this argument were sound, the assignment would also be unperfected under New York law. However, by the terms of section 9–104(g) of the Code as enacted in both states, Article 9 does not apply to transfers of interests in insurance policies. Neb.Rev.Stat. U.C.C. § 9–104(g); N.Y.U.C.C. Law § 9–104(g) (McKinney). Thus, the validity of the assignment must be determined by reference to law other than the Uniform Commercial Code. 3, part 2, *Collier on Bankruptcy*, Para. 60.-51[1.1] at 1047–48 (14th Ed. 1977).

■ In New York, rights based on existing contracts or claims are assignable even where the value or existence of the right depends on future contingencies. *Stathos v. Murphy*, 26 A.D.2d 500, 276 N.Y.S.2d 727, 733 (1966), aff'd, 19 N.Y.2d 883, 281 N.Y. S.2d 81, 227 N.E.2d 880 (1967). Such assignments are valid against the claims of subsequent judgment creditors of the assignor. *Id.* Although the business of premium financing is regulated by statute in New York, the statutes merely regulate licensing of lenders and the form of premium financing agreements and do not alter the general state law pertaining to assignments. See N.Y. Banking Law Art. 12–B (McKinney).

■ No Nebraska statute is applicable here, but the Nebraska Supreme Court has considered the subject of assignment on several occasions. The court has long held that future payments arising out of an existing contract are assignable even if the right to receive the payments is contingent on some future event. *First Nat'l. Bank v.*

*School Dist.*, 77 Neb. 570, 110 N.W. 349 (1906). Specifically, rights in insurance policies are assignable. Assignment may be by a separate writing, endorsement on the face of the policy, or even by oral agreement between the parties. *In re Estate of Dalbey*, 143 Neb. 32, 37, 8 N.W.2d 512 (1943). The effect of assignment is to "vest all title in the assignee that the assignor possessed." *Amy v. Mann*, 136 Neb. 677, 683, 287 N.W. 84, 87 (1939). Accordingly, assigned property may not be garnished or levied upon by creditors of the assignor. *Lathrop v. Schlauger*, 113 Neb. 14, 201 N.W. 654 (1924).

 Thus, by the laws of either New York or Nebraska, the trustee's claim cannot prevail. The trustee's powers under section 70 of the Bankruptcy Act do not enable the trustee to claim property for the estate which, under applicable state law, could neither have been transferred by the bankrupt nor levied upon unless the assignment itself constituted a preference or was made with intent to defraud creditors. *Adelman v. Centaur Corp., supra*, at 575–76; see also *Creel v. Birmingham Trust Nat'l. Bank*, 383 F.Supp. 871 (N.D.Ala.1974). As neither preference nor fraud is an issue here, it is necessary to consider which of the defendants is entitled to the funds.

When Northfield cancelled Redfeather's policy, it credited the unearned premium to Mark III. Mark III added in its unearned commission and credited the total, $26,936.00, to Country Wide. Country Wide's president testified at trial that he is holding that amount in a trust account for the benefit of AICCO. Later, when Northfield decided that it should have paid the money into this Court, it called Mark III and demanded the return of the money. Mark III issued a check for $26,936.00 to Northfield. Northfield cashed the check and issued a check in the same amount drawn on its own account to this Court. Mark III neither asked for nor received reimbursement from Country Wide. Both Mark III and AICCO are claiming the funds held by this Court. Country Wide does not claim the funds but asserts that they should go to AICCO.

Clearly, there are two funds requiring disposition. The funds which have been paid into this Court must be returned to Mark III. In addition, by virtue of its equitable power to work complete justice among the parties before it, this Court will order Country Wide to pay over to AICCO the funds it received from Mark III plus any unearned commissions which Country Wide may be required to add to the fund.